[No. 28197. *En Banc.* April 25, 1941.]

J. F. SEARS, *Respondent,* v. INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, STABLEMEN AND HELPERS OF AMERICA, LOCAL No. 524, *et al., Appellants.*[1]

[1]Reported in 112 P. (2d) 850.

448

*J. P. Tonkoff* and *Vanderveer, Bassett & Geisness,* for appellants.

*Cheney & Hutcheson,* for respondent.

MAIN, J.—This action was brought to recover damages for breach of a contract which, the plaintiff alleges, was caused by the defendants. The answer was a general denial. The cause was tried to a jury, and resulted in a verdict in favor of the plaintiff in the sum of eleven hundred and fifty dollars. The defendants moved for a judgment notwithstanding the verdict, and, in the alternative, for a new trial, both of which motions were overruled. From the judgment entered on the verdict, the defendants appeal.

The principal question in the case is whether the evidence was sufficient to sustain the verdict of the jury. In many particulars, the evidence is in dispute. In stating the facts, we will only state them in so far as they are presented by the evidence of the respondent.

The Washington Asphalt Company had a contract for doing certain road work near the town of Keller, in Ferry county. J. F. Sears was also a road contractor, and owned equipment for that purpose. In-

cluded in this equipment was a power shovel. This shovel was loaded on a truck and trailer, and was in the process of being transported to Keller. The operator of the truck was not an employee of any of the parties here concerned.

On the 15th day of August, 1939, the operator of the truck, one C. F. White, stopped about five miles west of Yakima for lunch. Prior to this time, the Washington Asphalt Company had contracted with the respondent for the use of his equipment upon the Keller job. While the operator of the truck was at lunch, one Mike Burgwin, who was the business agent of the International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of America, Local No. 524, came to the place where White was having his lunch, and told him that the shovel was "hot," for the reason that the respondent was unfair to organized labor. Soon afterwards, Eugene Duffy, who was the business agent of the International Union of Operating Engineers, Local No. 302, came to the same place.

A conversation then took place between the three of them, and it was agreed that, in the afternoon, they would meet at the Labor Temple in Yakima for a conference. After they met there, one Jess Wallis, who was an employee of the respondent, or had been, was telephoned for, and, apparently, in this conference, he represented the respondent. The conference lasted for two or three hours, during which a telephone call was put through to Seattle, and a conversation was had, either by Duffy or Burgwin, with one Jack Mc-Donald, who was also a business agent of the engineers' union. Another conversation was had with one Howard Cooper at Seattle. This latter conversation was for the purpose of ascertaining whether the respondent was, in fact, the owner of the shovel.

With reference to this conference, Wallis, in part, testified:

"Q. Did they ask you to remain there until they had this conversation? A. Yes, they did. Q. Do you remember which of them? A. Mike Burgwin. Q. Then just go ahead. What else was said up there in your presence? A. In reference to what? Q. Well, in any way pertaining to this that was said in your presence. A. Well, Mike Burgwin made the statement that if Sears thought he was going to use Howard Cooper for a stooge that they were going to stop him in his tracks, that they were going to stop that shovel right there, it wasn't going to move any further. Q. You say Burgwin said that? A. Burgwin made that statement. Q. Was Duffy present at the time? A. Yes, he was; that's when the three of us were in the Engineers office, what they call the Engineers office. Q. All right; just go ahead and state what happened after that. A. Well, about all that happened after that was waiting around there. It took about an hour and a half or two hours before they got the result back from Seattle to see whether— find out for sure, and as soon as they found out Howard Cooper did not own the shovel and that it was Sears' shovel, they said, that's all, the shovel was going to move no farther, and asked me if I knew any place to unload it."

This witness, on cross-examination, further testified that he heard Duffy say, on three or four different occasions, that: "We are going to break Sears." Previous to this time, and while the respondent had a contract for road work to be done near Cle Elum, Kittitas county, a controversy arose between him and his union employees over the wage scale, and there was a strike.

Following the conference which is just referred to, the shovel was unloaded from the truck and trailer, and was left in Yakima. Wallis says that he did not assist in unloading the shovel, and did not know who

did it. After the telephone conversation with Mc-Donald, he telephoned to Wayne Sutton, who was one of the partners in the Washington Asphalt Company, and, as a result of that conversation, Sutton telephoned the respondent that they would not use his equipment upon the job at Keller.

The theory of the respondent's case was that Burgwin and Duffy, as business agents of their respective unions, had entered into a conspiracy to prevent the respondent from carrying out his contract with the Washington Asphalt Company.

■ The appellants first contend that the evidence in support of the charge of conspiracy is not sufficient to take the case to the jury. With reference to what constitutes a conspiracy, in *Eyak River Packing Co. v. Huglen,* 143 Wash. 229, 255 Pac. 123, 257 Pac. 638, it is said:

"A conspiracy is a combination of two or more persons to commit a criminal or unlawful act, or to commit a lawful act by criminal or unlawful means. . . . Every person who enters into a conspiracy, no matter whether at its beginning or at a later stage of its progress, is in law a party to every act of the conspirators, and is liable for all of the acts done in pursuance of the conspiracy in the same manner that they would be had they been a party to all of the wrongful acts."

■ Conspiracies need not be established by direct and positive evidence, and are seldom susceptible of such proof. They may be proven by circumstantial evidence, or be established by inferences like any other disputed fact. *Karr v. Mahaffay,* 140 Wash. 236, 248 Pac. 801; *State v. McGonigle,* 144 Wash. 252, 258 Pac. 16.

■ One who induces or persuades another to break a contract is liable in damages. In *Pacific Typesetting*

*Co. v. International Typographical Union,* 125 Wash. 273, 216 Pac. 358, 32 A. L. R. 767, it is said:

"The elementary principle invoked to sustain the appellant's position is that which is inscribed on the old landmark of the law—*Lumley v. Gye,* 2 El. & Bl. 216—that a third party is liable in tort for his persuasion of one to break his contract with another, a principle which has received continual sanction. In one of the recent cases re-announcing the doctrine, *Central Metal Products Corporation v. O'Brien,* 278 Fed. 827, it is said 'it is settled law that one may not induce or persuade, much less coerce, one to break his contract with another.' *New England Cement Gun Co. v. McGivern,* 218 Mass. 198, 105 N. E. 885; *Parkinson Co. v. Building Trades Council of Santa Clara County,* 154 Cal. 581, 98 Pac. 1027. The effort here is to coerce the appellant to breach its contracts with the printing establishments."

 In this connection, the appellants appear to contend that there was no evidence from which the jury could find that Burgwin and Duffy had acted maliciously in causing the breach of the contract. The definitions of "conspiracy," in many instances, use the word "malicious" as an element necessary to be established. That, however, does not necessarily mean ill will or actual malice, but does mean an intentional interference with a right without lawful justification, and, as such, is malicious in law. In *R An W Hat Shop v. Scully,* 98 Conn. 1, 118 Atl. 55, 29 A. L. R. 551, it is said:

"The sense in which maliciously is used by this court is expressed in *Bitterman v. Louisville & N. R. Co.,* 207 U. S. 205, 223, 28 Sup. Ct. 91: 'It is not necessary that the ingredient of actual malice in the sense of personal ill will should exist to bring this controversy within the doctrine of the *Angle Case* [151 U. S. 1, 14 S. Ct. 240].' "

Further in the same opinion, it is said:

"In an action on the case for a breach of plaintiff's contract of employment, the court, in *Berry v. Donovan,* 188 Mass. 353, 355, 74 N. E. 603, declared: 'The primary right of the plaintiff to have the benefit of his contract and to remain undisturbed in the performance of it is universally recognized. . . . Such a right can lawfully be interfered with only by one who is acting in the exercise of an equal or superior right which comes in conflict with the other. An intentional interference with such a right, without lawful justification, is malicious in law, even if it is from good motives and without express malice.'"

■ Under the law as above set forth, the jury in this case had a right to find that Burgwin and Duffy were guilty of a conspiracy, and that they caused the Washington Asphalt Company to breach its contract with the respondent, and, as a result thereof, the respondent suffered damages.

This holding in no way interferes with the right of labor unions to disseminate information and advise the public as to their stand in an existing labor controversy, within the limits prescribed by law. *Sterling Chain Theaters v. Central Labor Council,* 155 Wash. 217, 283 Pac. 1081; *Zatt v. Building Trades Council,* 172 Wash. 445, 20 P. (2d) 589; *Kimbel v. Lumber & Saw Mill Workers Union,* 189 Wash. 416, 65 P. (2d) 1066; *Shively v. Garage Employees Local Union No. 44,* 6 Wn. (2d) 560, 108 P. (2d) 354.

■ The appellants next contend that the court erred in its definition of conspiracy in one of the instructions given to the jury, for the reason that it was not defined as § 2382, Remington's Revised Statutes, defines conspiracy. That statute sets forth certain things which, if two or more persons do, they are guilty of a gross misdemeanor, and has no application to a

civil proceeding, such as the one we are now considering.

In 15 C. J. S. 1001, § 7, it is said:

"As stated in Corpus Juris, which has been quoted and cited with approval, while one who suffers from a conspiracy forbidden by the criminal law may maintain a civil action for damages caused by the parties to the combination, it is not essential to civil liability for a consummated conspiracy to do an unlawful act that the means resorted to to effect the purpose should be criminal or that the act should be criminal. It is sufficient if it be to commit an act wrongful because of its affording a ground of action, either civilly or criminally."

■ Further, in this connection, the appellants contend that they had a right to do what they did, and rely upon chapter 185, Laws of 1919, p. 568, which may be referred to as the anti-injunction act in labor disputes. We see nothing in that act, which justifies the conduct of Burgwin and Duffy, of which the jury had a right to find they had been guilty. In an annotation which follows the case of R An W Hat Shop v. Sculley, supra, it is said:

"The rule is well settled that an individual or labor union which maliciously or wantonly interferes or intermeddles with a contract between third persons, for the purpose of securing a breach thereof, is liable for the damage resulting if the contract is actually breached."

■ It is next contended that the trial court erred in giving certain instructions. For the most part, the contention with reference to this point has been answered by what has already been said. Two matters only will be referred to. In one of the instructions complained of, the word "wrongful" is used, rather than "unlawful." While this is technically incorrect, it is a matter not of any very great consequence, be-

cause it is plain from the other instructions that the jury could not have been misled thereby.

Another objection to the instructions is that they are conflicting, but we see no basis for this contention. The court properly instructed the jury upon the theory of the appellants' case as well as that of the respondent. The instructions, taken as a whole, fully and correctly presented the issues of the case to the jury.

It is next contended that the court erred in refusing to give the appellants' requested instruction No. 3. Again, it may be said that what has been hereinbefore said with reference to the law applicable to this case answers this contention.

It is next contended that the court should have granted the motion for new trial, because the verdict which was returned was a quotient verdict. Affidavits were produced which showed that the jurors each put down what they thought the amount of the verdict should be, and these sums were added together and divided by twelve. Other affidavits, however, make it appear that there was no agreement among the jurors, either prior or subsequent thereto, that any of the jurors would be bound by the result of such average computation; and in these affidavits it further appears that, after the computation was made, the jury continued to discuss the case for a considerable time, and thereafter several ballots were taken, finally arriving at the amount of the verdict returned therein, which was the sum as the computation showed; and that this amount was agreed to by each and all of the jurors without regard to the computation of the average or quotient, as above stated.

Where the jurors have not, in advance, agreed to abide by the result of the computation, and, after a quotient has been arrived at by adding and dividing,

the requisite number of jurors vote for a verdict in this sum, it is not subject to the objection that it was arrived at by lot or chance. *Loy v. Northern Pac. R. Co.*, 77 Wash. 25, 137 Pac. 446; *Oliver v. Taylor*, 119 Wash. 190, 205 Pac. 746.

Finally, a suggestion is made in the latter part of the reply brief of the appellants that the court erred in taxing the witness fees. No assignment of error is made with reference to this matter, and it is not mentioned in the appellants' opening brief, and, consequently, is not here for consideration.

The judgment will be affirmed.

ROBINSON, C. J., BEALS, STEINERT, SIMPSON, and JEFFERS, JJ., concur.

MILLARD, J. (dissenting)—Was it lawful for appellants to publicize the existence of a labor dispute between appellant unions and respondent, Sears? If that question is answered in the affirmative—such publicizing is the only act, under the evidence, of which appellants are guilty—the verdict should be set aside.

That labor unions have the right to inform the public at large, and persons especially interested, that a certain business or plant has been by labor unions declared unfair, has been a number of times upheld by this court and other courts, including the United States supreme court.

Mike Burgwin, business agent of the International Brotherhood of Teamsters, met, encountered, or intercepted one White, a union teamster, who was employed by a Spokane contracting firm in transporting one of respondent's power shovels to Ferry county, where the shovel and the operator and other equipment mentioned in respondent's complaint were to be employed by the Washington Asphalt Company on a road con-

struction job. Shortly prior to this meeting of Burgwin with White, respondent Sears had been employed with his equipment on a construction job near Cle Elum where he became involved in a labor dispute with appellant labor unions and as a result the members of the two unions went on strike.

For many years the Washington Asphalt Company had been operating under a contract with both appellant unions, and the work in Ferry county was to be performed under that contract. Deeming it his duty, under the facts stated, Burgwin informed White that respondent was unfair to the appellant unions and that there was a strike in existence against the respondent. White replied that, in that event, he would have nothing more to do with hauling of the shovel. Very shortly thereafter, appellant Eugene Duffy, business agent of the International Union of Operating Engineers, Local No. 302, appeared and joined in the discussion, at which time the operator of the shovel had appeared, and all of the parties went to the Labor Temple in Yakima to ascertain by long-distance telephone whether the shovel was to be used on the Washington Asphalt Company contract in Ferry county.

White called his employer at Spokane, which employer instructed White to unload the shovel at Yakima, which was done. Duffy telephoned to Seattle and informed one Jack McDonald (he is not a party to this action), an official of appellant engineers' union, that the shovel was routed for the Washington Asphalt Company job. McDonald telephoned the asphalt company and advised one of the officials of that company that respondent was unfair to union labor. About a month prior to this time, the asphalt company official to whom McDonald telephoned had a discussion with respondent respecting the job in Ferry county. He then advised respondent that the asphalt company

could use his equipment on that job, provided respondent kept in good standing with the union. As a result of the conversation of McDonald with the asphalt company's official, the asphalt company refused to employ the respondent or his equipment.

It may be that appellants' disclosure of the fact of the labor dispute vexed respondent, but however annoying such disclosure may have been, such annoyance or vexation and the fact that the disclosure of the existence of a labor dispute prevented respondent from securing or retaining the job with the Washington Asphalt Company, are not a sufficient basis for maintenance by respondent of an action for damages against either of the appellant labor organizations or the individual members of those organizations, as none of the acts of which respondent complains is unlawful.

There was no conspiracy to accomplish a criminal or unlawful purpose, nor was there a conspiracy to accomplish a purpose, not in itself criminal, by unlawful means. In *Kemp v. Division No. 241 etc.*, 255 Ill. 213, 99 N. E. 389, Ann. Cas. 1913D, 347, the court refused to enjoin a threatened strike by members of a labor organization unless the employer discharged his employees who were not members of the union. The injunction was denied on the ground that the threat on the part of the union members was not unlawful, and, if the attempt to carry it into effect resulted in the discharge of the nonunion employees, those employees would not be entitled to maintain an action for damages.

There are numerous authorities to the effect that a complaint in an action for damages based on discharge of plaintiff from his employment because of a demand made by a defendant labor organization, and a threat that if plaintiff were not discharged from

his employment the union employes would strike, does not state a cause of action for damages against either the labor organization or the individual members. *Roddy v. United Mine Workers,* 41 Okla. 621, 139 Pac. 126, L. R. A. 1915 D, 789.

In *National Protective Ass'n etc. v. Cumming,* 170 N. Y. 315, 63 N. E. 369, 88 Am. St. 648, 58 L. R. A. 135, it was held that a labor organization may refuse to permit its members to work with members of a rival organization and may notify employers of members of a rival organization that a strike will be ordered unless such servants are discharged; and, if the object is to secure work for the members of the union, the rival organization may not, nor may any member discharged as a consequence of such threat have a right of action against the union or any of its members.

The position of appellants is sustained by *Zatt v. Building Trades Council,* 172 Wash. 445, 20 P. (2d) 589; *Kimbel v. Lumber & Saw Mill Workers Union,* 189 Wash. 416, 65 P. (2d) 1066; *Marvel Baking Co. v. Teamsters' Union Local No. 524,* 5 Wn. (2d) 346, 105 P. (2d) 46, all of which are to the effect that it is lawful for workmen to organize and form unions and that it is lawful for labor unions to convey to the public at large, and to persons especially interested, information that a certain business has been by labor unions declared unfair.

Particularly apposite is the recent case of *American Federation of Labor v. Swing,* 312 U. S. 321, 61 S. Ct. 569 (*Swing v. American Federation of Labor,* 298 Ill. App. 63, 18 N. E. (2d) 258; 372 Ill. 91, 22 N. E. (2d) 857), in which the United States supreme court held that the right of labor unions to convey to the public at large, and to persons especially interested, information that a certain business has been by labor unions declared unfair cannot be destroyed by a state regula-

tion or statute; that members of a labor union may, without special statutory authorization by a state, make known the facts of a labor dispute under the fourteenth amendment to the United States constitution which guarantees freedom of speech.

Our opinion in each of the following cases is contrary to the opinion of the United States supreme court in *American Federation of Labor v. Swing, supra,* therefore we should recede from the position we have heretofore taken and expressly overrule the three cases:

*Safeway Stores v. Retail Clerks' Union,* 184 Wash. 322, 51 P. (2d) 372; *Adams v. Building Service Employees etc. Union,* 197 Wash. 242, 84 P. (2d) 1021; and *Shively v. Garage Employees Local Union No. 44,* 6 Wn. (2d) 560, 108 P. (2d) 354.

The constitution of the United States is the supreme law of the land. Interpretation of that constitution by the United State supreme court is binding on us; therefore, we can not hold otherwise than that appellants' acts, of which respondent complains, were lawful.

If appellants acted lawfully in conveying the information in question—it must be conceded, under the authorities, that they acted lawfully—it follows that no recovery may be had against any of the appellants.

The judgment should be reversed and the cause remanded, with instructions to dismiss the action.

BLAKE and DRIVER, JJ., concur with MILLARD, J.