[No. 37640. Department One. November 18, 1965.]

ACCURATE PRODUCTS, INC., *Respondent,* v. ROBERT H. SNOW *et al., Appellants.*

XCELITE, INCORPORATED, *Respondent,* v. ROBERT H. SNOW *et al., Appellants.*

GENERAL AUTOMOTIVE SPECIALTY CO., INC., *Respondent,* v. ROBERT H. SNOW *et al., Appellants.*\*

*Morrison & Huppin,* for appellants.

*Hamblen, Gilbert & Brooke (Fred W. Gilbert,* of counsel), *George J. Pfeiffer,* and *John M. Kitchen,* for respondents.

MacIVER, J.†—The respondents, Accurate Products, Inc., of Indianapolis, Indiana, Xcelite, Inc., of Orchard Park,

\*Reported in 408 P.2d 1.

†Judge MacIver is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

New York, and General Automotive Specialty Co., Inc., of New York, New York (hereinafter referred to as Accurate, Xcelite, and General), are manufacturers and suppliers of goods, primarily in the automotive line. Respondents, in cases consolidated for trial, secured judgments against Robert H. Snow and Elsa L. Snow, husband and wife, doing business under the trade name of Snow Sales Company and Auto Parts Company, hereinafter referred to as Snow, for moneys due for the sale of merchandise on open account, at the time the respondents each stopped doing business with the appellants.

Snow's claim of a right, under a general custom and practice of the trade, to return merchandise to General and Xcelite, and receive credit therefor, was denied by the trial court. Snow's claim of a right under a contract to return merchandise on hand to Accurate was also denied.

In each case, by cross claim, Snow alleged a conspiracy of the principal officer of each corporation, together with employees of Snow, to simultaneously have the manufacturers withdraw lines of merchandise from representation by Snow, and give them to individual salesmen of Snow who would then withdraw from the Snow organization and assume individual manufacturer's representative's capacities with each of the three manufacturers.

In each case, the cross claim seeks damages for losses allegedly sustained by reason of such conspiracy.

The trial court, finding that the evidence did not establish the alleged conspiracy, dismissed the cross claims.

Snow, for a number of years, was engaged in business in Spokane as a warehouse distributor and manufacturer's representative of automobile parts and supplies. His business extended over 11 western states. He represented a number of manufacturers, including the respondents, and warehoused their products in various cities.

Snow purchased Xcelite products on open account, payment was to be made on the 10th of the month following receipt, and received a discount beyond the distributor's

cost for representing and warehousing the line and for carrying the account.

Snow was both a warehouse distributor and representative for General's products, purchasing their goods at a discount off the jobber's list. Payment for General's goods was to be made on the 10th of the month. Snow had no written contract with either General or Xcelite.

The appellant Snow testified that it was the custom of the industry in Spokane and the 11 western states to allow the return of new stock and obsolete and defective merchandise, upon the termination of an agency. His testimony was contradicted by the testimony of Mr. Warden of Xcelite and Mr. Herman of General, although Mr. Warden and Mr. Herman testified that their companies had policies of accepting obsolete and defective merchandise. Upon termination of the agency, Xcelite offered to take back all of its goods. Mr. Snow never replied to this offer and made no tender to return the merchandise, except by trial amendment. General also offered to take back all of Snow's merchandise when their association was terminated. Snow refused this offer. Later Snow tendered the return of some goods from the Denver warehouse. General agreed to accept this merchandise at full credit provided Snow paid the balance of his account. This Snow refused to do. A tender of the return of merchandise to General was made by trial amendment.

The trial court's findings, upon conflicting evidence, that the evidence did not support the appellants' claim that trade practices in the industry afforded them a right to return merchandise, will not be disturbed. *Thorndike v. Hesperian Orchards, Inc.,* 54 Wn.2d 570, 343 P.2d 183 (1959).

The appellants claim that they had a right to return Accurate's products, under the provisions of a written contract.

For a number of years, Snow had handled Accurate products on a consignment basis. The stock was not billed to Snow, but placed in his warehouses to be resold by him to jobbers. When a sale was made, the warehouse operator

returned a "warehouse billing memo" to the factory. The billing of the invoice and the collecting of the accounts due was done by the factory. In this instance, Snow worked on commission as an agent.

September 6, 1960, by letter, Accurate proposed that the existing arrangement be changed and that thereafter Accurate sell its lines to Snow, who would become a "warehouse distributor." Snow was to receive his regular commission on merchandise shipped into his territory from the factory. He would bill his own accounts and do his own collecting and receive a 20 per cent discount on his purchases. In addition, Snow was to receive a discount for payments made by the 10th of the month.

Since, on September 6th, there were in Snow warehouses stocks of Accurate products, Accurate proposed to inventory such stocks, and realizing that the investment required in such an inventory might present a problem to the warehouse distributor, proposed a ledger balance arrangement whereby the inventory would be billed to Snow at jobber's net prices, less 20 per cent discount. "The amount arrived at will be your ledger balance, and you will only pay for the merchandise you would order, which would bring the amount billed to you in excess of the original ledger balance." The ledger balance was also referred to as a "floating balance."

To the letter proposing the new arrangement was attached a form of warehouse distributor's contract which contained the following clause:

TERMINATION: On 30 days written notice this contract can be terminated by either Accurate or W.D. At the time of termination W.D. agrees to return all Accurate merchandise for which payment has not been made to the Indianapolis factory, transportation charges prepaid. All merchandise returned will be credited to the W.D. at current W.D. cost and in the event there remains any amount due Accurate after the credit has been issued, this amount will be payable in cash.

Subsequent to the receipt of this letter, Snow went to Indianapolis and discussed the matter with Mr. Charles

Woods, president of Accurate. The changeover was made as Snow's warehouses were inventoried. Thereafter the inventoried stock was invoiced to Snow. Two signed copies of the proposed contract were sent to Snow as each of the warehouse points were changed over. Woods testified that Snow did not acknowledge receipt of the contracts; that he never received any signed copies from Snow; and that he never received any word from Snow that he was excepting to the written contracts. Although Snow testified that he signed contracts for some of the warehouses, he did not know which ones he signed. The trial court found that Snow had not signed the contracts.

Woods testified that Snow agreed that the inventoried stocks be invoiced or billed to him. Snow testified that after the contracts were received, the billing each month included the ledger balance, he deducted this from the account and sent a check for the balance.

About September 1, 1962, Woods advised Snow that he was going to give the agency part of his line in the Seattle and Los Angeles territories, to three of his salesmen, but that there was no reason for this to affect their warehouse distributing arrangement, or agency arrangement, in the other territories. Snow replied, "Hell, no, if I don't have the agency, I don't want the warehouse distributorship business, and if these men are going to be your agents, then the whole line will have to be thrown out."

By letter dated September 5, 1962, Accurate terminated all agreements with Snow regarding agency representation and warehousing, as of September 30, 1962. The letter stated that recommendations for the disposal of warehouse stocks would follow in a few days. By letter of September 20, 1962, Snow was advised of the balance owing Accurate, the total including the ledger balances, and that, if he was unable or unwilling to effect prompt payment, Accurate would accept for credit, at Snow's cost, the present inventory of Accurate's products at each warehouse point. Snow was instructed to release the merchandise on hand at the Los Angeles warehouse to a distributing company in Los Angeles, and the merchandise in the Seattle warehouse to

a warehouse in Tacoma. The letter further stated that release instructions on the other warehouses would follow in a few days; that Snow's written acknowledgment, indicating his compliance was expected by October 5, 1962, and if not received by that date, that the offer to accept the inventories for credit would be withdrawn and steps taken to collect the account.

Snow made no reply to either the letter of September 5th or the letter of September 20th, and continued to sell the merchandise he had on hand, and in late September, placed additional orders for merchandise with all three factories. Snow testified that when placing these additional orders he did not know if he intended to return additional merchandise, but that he did not have to return it. Snow made no objection to the conditions contained in the letter of September 20th, did not ask to return the merchandise to Indianapolis, and made no complaint that the notice of termination was defective. Woods testified that transferring Snow's stock to other warehouses in the West, rather than to Indianapolis, would result in savings in freight to Mr. Snow, and eliminate the necessity of shipping the stock back to the coast again, but that if Snow had insisted on returning the stock to Indianapolis he would have agreed.

Having no response to his letter of September 20th, Woods shipped Accurate products from Indianapolis to supply the new warehouse distributors. Thereafter, Accurate had no need for the Snow merchandise, and when Snow had two shipments of merchandise from the Los Angeles warehouse forwarded to Indianapolis on October 29th and November 1st, Accurate refused the merchandise and advised Snow that they would continue to decline to accept his merchandise. Formal tenders of return of merchandise were not made until after suit was commenced. Snow never did offer to return all the Accurate merchandise, but only enough to reduce the book balance, and in choosing what to return, he testified, that he "selected off the card the stuff that wasn't moving so well."

The trial court found that the parties orally agreed to the transfer of title to the consigned stock; that further

purchases would be on an open account basis and that appellants would each month pay the portion of the account in excess of the ledger balance as proposed by Woods. The court further found that the proposed warehouse distributor contract embodying the terms of the oral agreement, and other terms, signed and submitted by Woods, were not signed by Snow and never took effect.

There being substantial evidence to support the court's findings of the oral agreement and of the failure of Snow to sign the warehouse distributor contracts, those findings will not be disturbed.

Appellants' assignments of error present the further question of whether the facts, as found by the trial court, support the court's conclusion that the proposed written contracts never took effect. Were the written contracts in effect, Snow was entitled to 30 days' notice of termination and was bound to return all of Accurate's merchandise for which payment had not been made to the Indianapolis factory, and Accurate was bound to credit the returned merchandise to Snow at his cost. It is the appellants' contention that despite the lack of Snow's signatures, the written contracts became effective and binding since the contracts were accepted by Snow and the parties acted under them. *Amherst Inv. Co. v. Meacham,* 69 Wash. 284, 124 Pac. 682 (1912); *DeBritz v. Sylvia,* 21 Wn.2d 317, 150 P.2d 978 (1944).

The trial court concluded that Snow's conduct did not indicate an acceptance of the written contract. We agree. The fact that Snow accepted the changeover from the consignment arrangement to that of sales on open account, and accepted the "floating balance" arrangement, does not indicate Snow's acceptance of the written contracts. Snow testified that he never discussed the termination provisions with Woods. Snow's conduct in continuing to order and to sell Accurate's products after notice of termination; his testimony that he did not have to return merchandise; his contention that he did not have to return all Accurate merchandise, but rather that he could select and return slow-moving items, indicate rather an intention not to be

bound by the provisions of the termination clause. Snow's failure to sign and return copies of the contracts to Woods, in itself indicates an unwillingness to be bound by all the proposed contract provisions.

The court further found that Accurate's offer to accept the return of merchandise was reasonable and proper but was not accepted by Snow; that Snow's later offer to return merchandise to Accurate was not in compliance with Accurate's offer and was not accepted by Accurate; that by continuing to sell such of Accurate products as he desired, Snow waived any claim of right to return merchandise on termination and that Snow's offer to return defective merhandise was not made until after termination and was not timely. We agree.

Blair Kline was Snow's salesman in Washington and Alaska. Jack Packer and Bob Weaver were Snow's salesmen in California. Packer also handled the Arizona territory. Each of the three testified to their dissatisfaction with the Snow organization. They were unable to get a satisfactory accounting of their commissions. Snow's method of inventory control resulted in their losing sales. They felt he was handling too many lines. There was concern about the future of the organization. Kline resigned July 14, 1962. When Weaver and Packer, in a conversation with Snow in late August, told him they were going to resign, Snow fired them. Accurate and General were satisfied with the business they were doing with Snow and wished to continue. Xcelite was dissatisfied with Snow. When the salesmen were no longer in Snow's employ, the respondents terminated their agreements with Snow and gave the salesmen their lines.

The trial court in the Accurate case made the following findings:

8. With respect to the alleged conspiracy, the Court finds that there was no combination or agreement to act together according to a preconceived plan entered into by the plaintiff with Xcelite Incorporated or General Automotive Specialty Co., Inc., or with Dick Beck or with other former employees of the defendants and none of

them agreed with either of the parties upon any course of action or purpose to be accomplished. They did not enter into any agreement or combination simultaneously to remove their lines of merchandise from the defendants' sales organization or to entice away from the defendants' employment any of the defendants' employees. None of the parties sought to accomplish an unlawful purpose and none of them engaged in any unlawful acts or used any unlawful means to accomplish a lawful purpose. Each of the three manufacturers had the right to remove their lines of merchandise from the defendants' organization at any time and each of them terminated their contractual relationship with the defendants' organization properly and lawfully. The action taken by each of the three manufacturers, including the plaintiff herein, in terminating their relationship with defendants' organization, was motivated by their desire to protect their own interests and therefore entirely consistent with an honest purpose. There was no evidence that the acts of the three manufacturers were motivated by any malice or illwill toward the defendants. Each of these parties acted entirely independently of the others and for their own lawful purpose.

9. The evidence fails to establish any unlawful conspiracy on the part of Blair Kline, Jack Packer and Robert Weaver that this plaintiff had any knowledge of, approved of or ratified any acts of these three former employees of the defendants. These three former employees, who quit the employ of the defendants, had a right to do so, and none of them committed any unlawful act or entered into any agreement or concert of action for an unlawful or improper purpose. The acts of these three former employees were not authorized by the plaintiff or solicited by the plaintiff in any way. Plaintiff did not offer or agree to employ any of the three former employees of the defendants while they were still working for the defendants, and plaintiff made no promises or commitments of any kind to said former employees while employed by the defendants, and plaintiff did not entice or attempt to induce any of defendants' employees to leave defendants' employment.

Similar findings were made in each of the other cases.

In *Harrington v. Richeson*, 40 Wn.2d 557, 570, 245 P.2d 191 (1952), we said:

> We have defined a conspiracy as a combination of two or more persons to commit a criminal or unlawful act, or to commit a lawful act by criminal or unlawful means. *Eyak River Packing Co. v. Huglen,* 143 Wash. 229, 255 Pac. 123, or as a combination of two or more persons by concerted action to accomplish an unlawful purpose, or some purpose not in itself unlawful by unlawful means. *Kietz v. Gold Point Mines,* 5 Wn. (2d) 224, 105 P. (2d) 71.
>
> A conspiracy need not be proved by direct and positive evidence, and a finding that a conspiracy existed may be based on circumstantial evidence. [Citing cases.]
>
> Before a party can be held liable as a conspirator the evidence must show that such person entered into an agreement with the other conspirators to accomplish the object of the conspiracy. [Citing case.]

The elements of a conspiracy must be established by evidence that is clear and convincing and the evidence is insufficient if it discloses acts as consistent with a lawful purpose as with an unlawful one. *Quackenbush v. Slate,* 12 Wn.2d 201, 121 P.2d 331 (1942). We have held that "The definitions of 'conspiracy,' in many instances, use the word 'malicious' as an element necessary to be established. That, however, does not necessarily mean ill will or actual malice, but does mean an intentional interference with a right without lawful justification, and, as such, is malicious in law." *Sears v. International Bhd. of Teamsters,* 8 Wn.2d 447, 453, 112 P.2d 850 (1941).

The appellants do not ask this court to retry the factual issues presented to the trial court. Appellants contend, however, that the trial court erred in not considering the rule stated in 11 Am. Jur. *Conspiracy* § 46, 578-79:

> [T]hat where an act done by an individual, though harmful to another, is not actionable because justified by his rights, yet the same act becomes actionable when committed in pursuance of a combination of persons actuated by malicious motives and not having the same justification as the individual.

Were we to so extend our definition of conspiracy it would be of no avail to the appellants here in view of the trial court's finding that the respondents acted not by agree-

ment or in combination, but independently, each motivated by a desire to protect its own interest.

We have carefully studied the extensive record in this case. There is ample evidence to sustain the trial court's findings of fact.

The judgments are affirmed.

ROSELLINI, C. J., HILL, OTT, and HUNTER, JJ., concur.