218

[No. 39292.     Department One.     July 25, 1968.]

HOWARD A. PIKE, *Respondent,* v. PARALLEL FILM DISTRIBU-
TORS, INC., *et al., Appellants.**

*Russell Millhouse,* for appellants.

*Raymond D. Ogden, Jr.* (of *Ogden, Ogden & Murphy*),
for respondent.

HALE, J.—The motion picture industry has not, as yet,
shown much of an inclination to locate in Washington. Al-
though the town of Blaine has long been noted for the
beautiful Peace Arch, which there joins Canada and the
United States in good will and harmony, Hollywood and
its movie makers seem to have ignored the town. Undoubt-
edly, millions of persons have gone through customs at
Blaine without one of them so much as suspecting that
here was a place in which to create a Hollywood of the
North Pacific country. Not so with Mr. George R. Borden,
proprietor of the Sea Vue movie theater there.

*Reported in 443 P.2d 804.

Mr. Borden envisioned the Blaine area as a good place for the building of a motion picture industry, and some of his friends caught the vision. He professed a professional knowledge of movie making and personal acquaintance with stars and producers. He was wont to mention a Mr. Sterling Hayden, a well-known film actor, who, as the owner of an island in the San Juans, would undoubtedly look with favor on the idea. There is nothing in the record, however, to show that Mr. Hayden ever participated in the idea—even remotely.

Borden mentioned to his friends his business connections with Parallel Film Distributors, Inc., a California corporation soon to be organized, and his friends helped him organize Parallel 49, Inc., a Washington corporation, which would make movies and employ film stars, directors, producers, and, in general, give competing film companies something to worry about. With his friends, he also organized a corporation named Parallel City, Inc., which was to build near Blaine a veritable city for the movie industry that would provide a place for movie stars and executives to dwell. Borden had no intention of slighting the people of Canada, so to enable them to share in his scheme he incorporated Parallel 49, Ltd., a Canadian company. Parallel 49, Ltd., would, like its counterpart Parallel City, Inc., in the United States, provide a film city in Canada where motion picture stars and executives would come and go and be seen in places of public entertainment.

Parallel City, on the Washington side, was to be designed in the architecture of the 1890's so that it could be used both for movie and television settings and earn rental income from television producers. Night clubs and cabarets, to be frequented by movie stars, would be set up there, and the public would flock in, spending its money freely while hobnobbing with movie stars, directors, and film tycoons.

But along with these enterprises and as a part of it, the immediate project was to *launch*—that is, promote the sale of—some motion pictures already produced. It was the sharing with Howard Pike of an opportunity to launch the

motion picture *Badjao* that led to this action. Howard Pike had grown up in Blaine where his father had served as a federal customs appraiser for 31 years. Pike graduated from Blaine High School and attended Western Washington State College for 2 years at Bellingham nearby. He served in the Army in World War II and upon his discharge went to work at Boeing Airplane Company in Seattle.

In October, 1961, Howard Pike attended a reunion of his high school graduating class at Blaine and stayed the night in the home of one of his old high school classmates, Kenneth West, a Blaine barber and later defendant in this case. During that Saturday evening after the reunion when the conversation shifted to the subject of investments, Mr. West disclosed to his old classmate that he had put some money in a certain enterprise headed by George Borden called Parallel Film Distributors, Inc., of California, a business connected in some way with the motion picture industry. He told his old friend, Pike, that both he and his brother, Ray West, had each invested $10,000 and Pike, who had never made any business investments of any kind before, said he had money he could invest. Kenneth West suggested that they talk to his brother Ray about it the very next morning, Sunday.

Next morning, Pike and his host, Kenneth West, and Ray West met briefly at Ray's house. Ray West said that he and his mother had invested $10,000 in what they called a motion picture launching. The Wests then promptly, by telephone, arranged to meet Borden immediately at his Sea Vue Theater office that same Sunday morning.

What transpired at the Sea Vue office was, of course, subject to conflicting and disputed testimony, but apparently the jury accepted in large part plaintiff's version of it. Kenneth West, Borden, and plaintiff Pike were the only ones present. Borden described his close acquaintance with several movie stars and producers and the ways in which several corporations would function to build a motion picture industry in the Blaine area. Plaintiff knew Borden from earlier years as owner of the Sea Vue Theater in

Blaine, but had no knowledge whatever of film making and distribution.

The initial investment opportunity available to Pike would consist of a chance to *launch* a motion picture. Borden then described to him what was meant by launching a motion picture. Launching, said Pike in narrating to the jury what Borden had told him that morning, meant

bringing the news media, or the news reporters for the trade publications of the theaters, they have luncheons and stuff when they get together . . . . Launching . . . is the actual getting started of the distribution of a motion picture.

As part of the launching Pike said he was told the film companies made ad mats and a theater brochure and short 3-minute movies advertising the picture as a coming attraction, showing actual scenes from the movie being launched. The launching, as plaintiff described it further, consisted of preparation of advertising materials, good will promotion, luncheons for members of the press and, in general, a program to whet the public's interest in the film. According to Borden, testified Pike, the first income from the movie would go to the party putting up the launching fund; after full reimbursement, he would thereafter share in the film's profits and in all likelihood would make a lot of money.

During the conversation concerning the film industry in general and the financial opportunities it presented to the wise investor, it was pointed out to Mr. Pike that an immediate and direct way of participating was to put up $10,000 immediately for launching a motion picture called *Badjao*. Pike said Borden told him that *Badjao*, a picture made in and concerning the Philippines was ready for launching; that it could be launched for $10,000; and that the profits from the launching could, as had already happened to several prominent persons who had launched other pictures, make him rich.

Out of the film's gross income, said Borden, according to Pike's testimony, would first come the $10,000 advanced by the individual who undertook the launching. After reimbursement of the launching fund from the first earnings,

he would share thereafter in all of the profits as long as the picture was shown anywhere.

Pike, in testifying as to Borden's explanation of a launching, also described the Parallel City enterprise:

He said that Parallel City— Q. All right, wait a minute now. Will you tell us what he said about Parallel City as far as his interest in it or your possibility of investment in it, or just what was said? A. He said Parallel City is a city in the daytime, will be used to produce motion pictures in. It's going to be built on the 1890 style. In the evenings after 5:00 o'clock the city part will open to the general public. They will also take movies at times, or imitate they're taking movies to make the people think that in a crowd scene they might be shown in some picture, and this picture city will be open to other producers from California and otherwhere, in New York, if any of these producers wish to come out here and make their picture there, both for TV, the TV was coming, and he said the paid TV would be coming along shortly, too.

He testified that Borden told him:

[T]he actors and actresses that will be there in the city during the daytime to make these motion pictures, they'd be, come down into the city again at night for added attraction to get, for the customers who come up to do business here, and Parallel City, every other building is a dummy front; that's to spread out the area. They're going to have a Chinatown, an Indian village, and a Mexican area, and they're going to have two saloons. Walter Brennan would have one saloon and Jimmy Davis would have the other.

Mr. Pike decided then and there to invest, returning to Seattle that very night to obtain some money. Next morning, Monday, he cashed in about $8,400 in United States Savings Bonds (Series E) and withdrew about $1,600 from his checking account and delivered the $10,000 to Borden. In return, he received an agreement from and receipt signed by defendants Dohner and MacMillan entitled "Agreement for Loan to Launch Moving Picture."

Aside from the profits to be derived from launching *Badjao*, there were to be other benefits. Pike said that Borden told him that one of the corporations would employ

him in driving and operating a 50-foot yacht at $150 per week; that he would also at a salary manage two saloons to be operated in one of the film cities.

Pike invested other sums too. He paid $500 into Parallel City, Inc., in October, 1961, and another $500 March 26, 1962, to help get the 1890 city started. Then, in May, he bought stock in one of the corporations for $400 and later he put another $1,000 into the enterprise, this time in Parallel 49, Inc.

It turned out that the film *Badjao* was not then ready for launching because it needed a number of changes, refilmings and additions before it would be considered by experts in the industry as commercially feasible for distribution. *Badjao* was never launched prior to trial, and plaintiff never received any part of his $10,000 launching investment either.

We need not delineate all of the charges, countercharges, claims, and disclaimers made by the parties here concerning fraud and deceit and the stout denials thereof. Suffice it to say that plaintiff in his complaint charged the defendants with obtaining from him the sum of $13,000 by means of false, fraudulent and deceitful representations. The jury awarded him $10,000 representing the sum invested by him on the so-called launching agreement, but nothing on the remainder of his claim concerning his investments in the defendant corporations.

Defendants appeal the judgment entered on the verdict, making 5 assignments of error which include assignments directed to the court's giving and refusal to give requested instructions. Our study of the record shows that the jury was properly instructed, and we find no reversible error concerning the instructions. Defendants summarize the remaining assignments contending: (a) conspiracy was not proved; (b) fraud was not proved; and (c) breach of contract was not proved.

As will be observed from the foregoing summary of the evidence, the case condenses to a question of whether there was sufficient evidence, if believed by the jury, to support a finding of conspiracy to defraud, perpetration of

fraud, and breach of contract—for all three are inextricably commingled in the record. If there were misrepresentations of material facts made either knowingly or recklessly and with an intent to induce the plaintiff to part with his money and to invest it, and plaintiff, acting reasonably, was induced by the misrepresentations and did invest his money, then the plaintiff has shown actionable fraud and deceit.

■ If, too, there was proved by clear and convincing evidence that the defendants entered into an agreement, implied or express, with one another to accomplish the purpose of unlawfully inducing the plaintiff by deceitful and fraudulent misrepresentation to invest his money, then the issue of conspiracy has been shown. *Kietz v. Gold Point Mines, Inc.,* 5 Wn.2d 224, 105 P.2d 71 (1940); *Accurate Prods., Inc. v. Snow,* 67 Wn.2d 416, 408 P.2d 1 (1965).

■ As to the elements necessary to establish fraud, we would adhere to the nine elements separately stated in *Webster v. Romano Engin'r Corp.,* 178 Wash. 118, 34 P.2d 428 (1934), and require again as we required then that each element be proved by clear, cogent, and convincing evidence (*Farrell v. Score,* 67 Wn.2d 957, 411 P.2d 146 (1966)); that the representations be of a then existing material fact, and that they be shown to be false. *Holland Furnace Co. v. Korth,* 43 Wn.2d 618, 262 P.2d 772, 41 A.L.R. 1166 (1953); *Williamson v. United Bhd. of Carpenters & Joiners of America,* 12 Wn.2d 171, 120 P.2d 833 (1942).

Our review of the record convinces us that plaintiff produced substantial evidence from which the jury could have affirmatively found the existence of each of the nine elements essential to establish actionable fraud by clear, cogent, and convincing evidence set forth in *Webster v. Romano Engin'r Corp., supra.* There was evidence that the plaintiff, in reasonable reliance on defendants' misrepresentations, invested $10,000 in launching the film *Badjao,* and also that the defendants conspired and agreed together to deceitfully induce plaintiff to make the investment. There was evidence, too, of representations made by the

defendants that plaintiff's $10,000 would be spent in a particular manner and for specified purposes, and conversely that the money was used in part to reimburse the defendants and not in the manner promised to plaintiff.

Not only does the record contain proof of actual misrepresentations, going far beyond mere puffing, salesmanship, or expression of personal opinions readily identifiable as such, but it contains evidence which, if believed by the jury, showed a suppression and withholding of information done with an intent to induce thereby the $10,000 loan or investment—a withholding of information which, under the circumstances, the defendants were bound in law to disclose. *Boonstra v. Stevens-Norton, Inc.,* 64 Wn.2d 621, 393 P.2d 287 (1964).

Affirmed.

FINLEY, C. J., WEAVER and McGOVERN, JJ., and WALTERSKIRCHEN, J. Pro Tem., concur.