ISRAEL PAGAN ESTATE and Leonor C. Pagan, Personal Representative, Plaintiff and Respondent,

v.

Joseph N. CANNON, Dorius Black, Alpha Leasing Company, a partnership; Robert D. Apgood, Joseph N. Cannon, Dorius Black, and Richard McKean, doing business under the name and style of Alpha Leasing Company; Bill Brown Realty, Incorporated; Scott Peatross, personally; Stewart Title Company of Utah; Tommy W. Sisk; Capitol Thrift and Loan, a financial corporation; and Merlyn Hanks, Defendants and Appellant.

No. 860072–CA.

Court of Appeals of Utah.

Nov. 16, 1987.

Rehearing Denied Dec. 2, 1987.

Kay M. Lewis, Salt Lake City, for appellant.

Mark S. Miner, Salt Lake City, for respondent.

Before BENCH, GARFF and JACKSON, JJ.

## OPINION

GARFF, Judge:

Defendant Capitol Thrift and Loan (Capitol) appeals from a jury verdict finding it liable to plaintiff Israel Pagan Estate for damages arising out of Capitol's alleged conspiracy with defendants Stewart Title Company (Stewart Title) and Joseph Cannon (Cannon) to defraud Pagan of his home. We reverse.

Pagan, a native of Puerto Rico, was unable to speak or understand English, and had subnormal mental capacity due to injuries suffered in an industrial accident. On July 30, 1980, with the help of his friend and interpreter, Emilio Ortiz, he listed his home for sale with Century 21 Real Estate. Ortiz, with a tenth grade education, was unsophisticated in real estate transactions.

On occasion, Cannon, who was a partner in defendant Alpha Leasing, worked with

Dorius Black, an independent businessman. Black, as part of a business arrangement with Cannon, signed an earnest money agreement with Century 21 on July 30, 1980, and executed a $1,000.00 promissory note for the purpose of purchasing Pagan's home. This earnest money agreement specified that Black was the purchaser of the home,[1] that he deposited $1,000.00 earnest money in the form of a promissory note, and that the purchase price of the house was $44,000.00. Of this price, $20,000.00 was payable as a down payment at closing, and the remaining $24,000.00 balance was payable as follows: payments were to be deferred for the first year; on August 1, 1981, a $2,630.88 interest payment was due; and on September 1, 1981, monthly payments of $242.67 were to begin, which were to be paid until August 1, 1982 when the balance was to be paid off with a balloon payment.

Stewart Title, acting as the escrow agent for this transaction, drew up the following documents: an escrow agreement, a trust deed note for the $24,000.00 balance bearing the same terms as the earnest money agreement, a request for reconveyance, copies of the buyer's and seller's closing statements, and a trust deed. Pagan and Cannon each paid $25.00 to set up this escrow account. Nothing in any of these documents indicated the existence of any other trust deed.

Black, who owed Capitol $4,848.75 at the time, referred Cannon to Capitol to obtain a loan for the $20,000.00 down payment. Although Cannon testified that he never actually applied for or negotiated with Capitol for this loan, Merlyn Hanks, a loan officer with Capitol, testified that Cannon had requested such a loan. The record indicates that Cannon filled out an application with Capitol for a $32,325.00 loan on August 13, 1980, five days prior to the closing; submitted to Capitol a signed personal financial statement, an Alpha Leasing financial statement, and a signed borrower's state-ment that the loan was to be used for strictly business purposes; and signed a business promissory note and security agreement for a $32,325.00 commercial loan from Capitol at 22% interest, payable in five monthly payments of $668.15, beginning September 18, 1980, with a balloon payment of $32,518.72 due on or before February 18, 1981. This loan was to be secured by a first trust deed against the Pagan property. These documents were not available to the parties during closing.

Pagan's house was appraised at $43,100.00. Hanks testified that he normally made loans for between 65 to 85% of the appraised value of a house, and that the $32,325.00 loan fell within this range ($28,015.00 to $36,365.00). He also testified that he was aware that Black and Cannon had a working relationship, and that Black had referred Cannon to Capitol to obtain the loan. However, he was unaware of the $24,000.00 agreement between Cannon and Pagan.

Closing was originally scheduled to take place at Stewart Title on the morning of August 18, 1980. Because the documentation was not completed, the closing was delayed until that afternoon. Pagan, Ortiz, Black, and Cannon were present during the entire two-and-one-half hour afternoon meeting, but agents from Century 21 and Bill Brown Realty, representing Pagan and the buyers respectively, were only present during portions of the transaction.

Tommy Sisk, representing Stewart Title, presided over the closing. He conducted it slowly so that Ortiz, who was translating for Pagan, would not be rushed. He stated that Pagan asked him questions about the transactions through Ortiz, which he answered, that he explained the documentation prepared by Stewart Title to all the parties, and that he explained to Pagan the following changes from the earnest money agreement: the substitution of Cannon for Black as buyer;[2] the existence of the Capi-

---

1. The earnest money agreement also stated that title to the property would vest as designated at closing, so another purchaser could be substituted for Black under the terms of the agreement.

2. Black testified that he was not purchasing the home for himself, but was purchasing it as part of a business venture with Cannon, and that the arrangement was between him, Cannon and Alpha Leasing only.

tol trust deed; that the total loan amounts would exceed the $44,000.00 purchase price of the property; and that the trust deed in favor of Capitol securing the $32,325.00 commercial note would be recorded ahead of the trust deed in favor of Pagan which secured the $24,000.00 note. However, he also stated that he did not know at that time what the exact amount of the loan from Capitol would be. He further explained to Pagan that Pagan would be in a second rather than a first position, and if Cannon did not pay, Pagan would have to pay on the Capitol loan to avoid losing his house. Sisk stated that he went through the entire closing before Pagan executed any documents. At the end of the closing, the parties signed the documents and copies were distributed.

The seller's statement of account, naming Pagan as the seller and Cannon as the buyer, indicated that the sales price of the house was $44,000.00, that there was a deed of trust on the property for $24,-000.00, and that the following closing costs were payable by Pagan from the $20,000.00 down payment: current taxes of $224.07, a title insurance fee of $211.00, an escrow fee of $37.50, a sales commission of $2,640.00, and a closing fee of $30.00. The balance due Pagan was $16,857.43, which he received.

Sisk stated that he did not review the disbursement checks, and that Cannon did not sign the note for $32,352.00, the accompanying trust deed in favor of Capitol, and the mortgage at the closing because these documents were delivered afterwards. He also indicated that the transaction between Pagan and Cannon was totally separate from Cannon's transaction with Capitol, that he had nothing to do with the transaction between Capitol and Cannon, that he had no knowledge that the closing involved Alpha Leasing, and that the substitution of Black for Cannon was not inconsistent with the terms of the earnest money agreement.

He testified that the transaction did not close in accordance with the earnest money agreement because of last minute changes, but that such last minute changes were common.

The broker representing the buyers [3] believed that Black and Cannon were working together as partners, and that Cannon was a more qualified buyer than Black. He understood that Black was the buyer, and was using Cannon as a guarantor on the loan, but that, at closing, the parties decided to make Cannon the buyer of record because Cannon was more qualified and they did not want to complicate the transaction further by adding an additional buyer. He stated that he was aware that there would be a first mortgage ahead of Pagan's trust deed, and that it would be for more than $20,000.00, but was not aware of the exact amount or the terms of the Capitol note.

Cannon testified that he attended the closing at Black's request, believing that he was only to be a guarantor of the loan. He was induced to do so on the grounds that Black, who was in arrears on lease payments owed to Alpha Leasing, had projects which, if funded, might be made sufficiently profitable to enable him to make the lease payments. During closing, however, Cannon was substituted for Black as purchaser, and, consequently, signed the following documents as the only obligor: the trust deed in favor of Stewart Title for $24,000.00, the escrow agreement for this trust deed, and a statement of account naming him as the buyer of the property. None of these documents indicated that Cannon was a guarantor rather than the purchaser. Nevertheless, he testified that he did not know that he was the purchaser, stating that although he had an opportunity to read the documents, he did not do so. He also testified that he was not aware that Black had signed any of the documents.[4]

3. The broker testified that he did not discuss the transaction with Capitol or Hanks, that none of the $4,848.75 returned to Capitol was paid to him, that he did not pay Black for bringing the transaction to his company, and that he was not representing Alpha Leasing.

4. That Cannon apparently consistently lied about his involvement in the transaction only goes to the issue of his credibility, and does not directly support any inference that Capitol was involved in this transaction as a conspirator.

The real estate agent representing Pagan at the closing indicated that he was aware that the $20,000.00 down payment would be borrowed, but did not know if it would be a first or second mortgage. He understood, however, that Cannon was financially stable, and believed that the documentation prepared by Stewart Title was exactly according to the earnest money agreement. He stated that he discussed the contents of the documents with Pagan, and that he was not aware of any misrepresentation made at the time. However, he never saw the documents brought over from Capitol after the closing and was not aware that more than $20,000.00 was to be placed against the home. He also believed that the terms and conditions had been significantly altered from the earnest money agreement because the loan was greater than $20,000.00, and that Pagan could not have understood the alterations unless they had been discussed with him when the agent was not present.

After the closing, Hanks brought the $32,325.00 loan check from Capitol to Stewart Title. This check, jointly payable to Stewart Title and Cannon, was accompanied by an instruction letter which directed that acceptance of the check would guarantee title insurance covering the Pagan property, title would be in Cannon's name, the trust deed would be the first recorded, and the funds would be disbursed as follows: $4,848.75 back to Capitol, recording and title insurance fees, and the remainder to Cannon or as he directed.

Cannon and Stewart Title endorsed the Capitol loan check and deposited it with Stewart Title to be disbursed according to instructions. Cannon, although his signature appeared on the back of the check, denied that he had ever seen the check or that he had endorsed it. From the loan proceeds, $4,848.75 was returned to Capitol, $331.00 was paid out for recording and title fees, $1,640.00 went to Bill Brown Realty as the buyer's share of the real estate commission, and $25.00 went for the buyer's share of the escrow fee.

Sisk recorded the trust deeds on August 19, 1980, recording the deed in favor of Capitol ahead of the deed in favor of Pagan as per Capitol's instructions.

Cannon received a check from Stewart Title for $13,471.57, representing his share of the proceeds from the Capitol loan. He deposited this check in the Alpha Leasing account. He testified that he then paid $1,000.00 earnest money to Bill Brown Realty, $4,848.75 to Capitol, and the remainder according to Black's direction, indicating that he received none of these proceeds personally. Black, however, testified that he did not receive the proceeds except for the $4,848.75 returned to Capitol which was applied to his pre-existing debt with Capitol.

Although Cannon testified that he did not recall making any payments on the loan personally or through Alpha Leasing, a $668.15 payment was made on October 14, 1980 on the $32,325.00 loan.[5] Cannon thought Black was going to be making the payments, but became aware that Black was not doing so when Capitol contacted Cannon about the loan. Cannon then contacted Black, who indicated that he would be taking care of the problem. Black did not make any further payments, however, and Cannon, whose financial condition had deteriorated substantially, was not then in a position to make the payments.

Cannon personally extended the loan in January 1981, at which time a $2,700.00 payment was made. Capitol sent notices of default to Cannon on the balance of the loan on May 11, 1981, and on September 1, 1981. Capitol then sold the property at a trustee's sale for $39,300.00, and initiated an action against Cannon to recover the remaining $12,726.58 balance.

At trial, Pagan had no recollection of the transaction. He also had no recollection of listing his home for sale, selling it, going to Stewart Title for the closing, or even what had happened to his house. Ortiz testified that he translated the events but did not

---

**5.** Plaintiff's assertion that this payment was made prior to the August 18, 1980 closing date is without support in the record.

understand what was happening, nor did Pagan. Ortiz stated that there was never any discussion concerning the $32,325.00 note, and that there was no discussion concerning the documents that Pagan was requested to sign. Ultimately, Pagan received nothing more for his $44,000.00 equity than the $16,857.43 down payment he received at closing.

A banking expert associated with Capitol testified that he had supervised the loan to Cannon and did not see anything unusual in it. At the time the loan was made, the prime rate was between 20 and 21%, first mortgage money was nearly non-existent, and many people were borrowing with short-term "bridge" loans, anticipating that when they matured, they could arrange for long-term financing. Because Capitol was primarily a second mortgage lender, many people unable to get first mortgages came to Capitol during that time for short-term financing. He also indicated that it was normal practice for such lending institutions to pay finder's fees of 2 to 3%, and that such a fee was paid to Black on the Cannon loan.

The jury concluded that there was clear and convincing evidence that Cannon, Capitol through Hanks, and Stewart Title through Sisk, were guilty of conspiracy to defraud Pagan of his property. It found Cannon liable for $12,000.00 compensatory and $4,000.00 punitive damages, Capitol liable for $12,000.00 compensatory and $4,000.00 punitive damages, and Stewart Title liable for no compensatory and $2,000.00 punitive damages.

Counsel for Pagan argues that the evidence supports a finding of conspiracy, in which Hanks, Black, and Cannon engaged in a confidence game to defraud Pagan.[6]

The sole appellant, Capitol, asserts that the verdict is not supported by the evi-

dence, but that the evidence indicates a normal business transaction that unfortunately happened to go sour.

■ To prove a civil conspiracy, plaintiff must show the following elements: (1) a combination of two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result thereof. *Citizen State Bank v. Gilmore*, 226 Kan. 662, 603 P.2d 605, 613 (1979); *Duffy v. Butte Teachers' Union*, 168 Mont. 246, 541 P.2d 1199, 1202 (1975) (quoting 15A C.J.S. *Conspiracy* §§ 1, 2).[7] Plaintiff must present clear and convincing evidence to carry his burden of proof on a charge of civil conspiracy. *Crane Co. v. Dahle*, 576 P.2d 870, 872 (Utah 1978).

*I & II: Two or More Persons and Object to be Accomplished*

Plaintiff asserts the following theory: All persons involved in this transaction joined in the alleged conspiracy. Their object was to defraud Pagan, whom they previously knew to be mentally deficient and, therefore, helpless, by taking his $44,000.00 property for $16,857.43, each obtaining some of the profit for himself. Capitol was to immediately receive a "kick-back" payment of $4,848.75 from Black; later, $39,300.00 from a trustee's sale of the property; and an additional $32,325.00 from a deficiency judgment against Cannon. Thereby, it could realize a $76,473.75 return from an initial investment of $32,325.00. Hanks, Cannon, and Black, immediately after closing, were to jointly receive $13,471.57 over the agreed first mortgage price, while the real estate agents were to receive exorbitant fees for their services.

■ Supporting this theory were the facts that Pagan only received $16,857.43

---

6. Pagan's brief left much to be desired as far as presenting a coherent statement of the facts and their application to the legal issues.

7. Utah has no civil conspiracy statute, as such, but it is well settled that such an offense exists at common law. The criminal conspiracy statute, Utah Code Ann. § 76–4–201 (1987), requires a showing of substantially similar elements: (1)

intention that the conduct constituting a crime be performed, (2) agreement between two or more persons to engage in or cause the criminal conduct, and (3) commission of an overt act in pursuance of the conspiracy by any one of the conspirators. A civil action further requires that there be damage as a proximate result of the conspiracy. *Duffy*, 541 P.2d at 1202.

from the transaction, that $4,848.75 was, indeed, paid to Capitol immediately after the transaction took place, and that Capitol ultimately received $39,300.00 from the trustee's sale of the property. However, the record also indicates that Capitol's deficiency action was for only $12,726.58. The difference between the original principal amount and the amount Capitol attempted to recover was accrued interest at 22%. Further, the record does not indicate that Hanks received any proceeds from the $13,-471.57 loan, but that the loan was disbursed to Cannon, and fails to indicate why Cannon would enter into such an unfavorable agreement. Thus, we find that there is no clear and convincing evidence that the parties' evil object was to defraud Pagan.

## III. A Meeting of the Minds

█ There is no direct evidence in the record of a meeting of the parties' minds with respect to defrauding Pagan of his property. However, it is not necessary in a civil conspiracy action to prove that the parties actually came together and entered into a formal agreement to do the acts complained of by direct evidence. *Holmes v. McKey*, 383 P.2d 655, 665 (Okl.1962). Instead, conspiracy may be inferred from circumstantial evidence, including the nature of the act done, the relations of the parties, and the interests of the alleged conspirators. *Wyatt v. Union Mortgage Co.*, 24 Cal. 3d 773, 157 Cal.Rptr. 392, 398–99, 598 P.2d 45, 51–52 (1979); *Chicago Title Ins. Co. v. Great Western Fin. Corp.*, 69 Cal.2d 305, 70 Cal.Rptr. 849, 856, 444 P.2d 481, 488 (1968). To prove conspiracy to defraud by circumstantial evidence, though, "there must be substantial proof of circumstances from which it reasonably follows, or at least may be reasonably inferred, that the conspiracy existed. It cannot be established by conjecture and speculation alone." *Dill v. Rader*, 583 P.2d 496, 499 (Okl.1978) (quoting *Chisler v. Randall*, 124 Kan. 278, 259 P. 687 (1927)).

The act in question is a real estate transaction, which normally requires the services of real estate agents, loan companies, title companies, and the existence of a buyer and seller. Such parties were present in this transaction.

The record clearly indicates that Black and Cannon, the buyers, were working together and that Hanks and the real estate agents were aware of that relationship. Stewart Title drew up all the documents except those prepared by Capitol. Black had a prior relationship with Capitol, including a $4,848.75 debt, which he paid off with proceeds from the $32,325.00 loan. Capitol required Stewart Title to pay back the $4,848.75 sum, to record its interest in the Pagan property first, and to disburse the proceeds of the loan to Cannon. Sisk, of Stewart Title, recorded Capitol's trust deed prior to Pagan's, pursuant to Capitol's instructions. The record indicates that the parties did not know of Pagan's mental infirmity prior to the transaction, but met Pagan for the first time at the closing. Pagan's expert witness, Dr. William Barrett, testified that a lay person would not be able to tell that Pagan was mentally disabled by looking at him.

Plaintiff asserts that these facts adequately support the inference that Hanks, Black, and Cannon engaged in a confidence game to defraud Pagan, whom they previously knew to be mentally deficient, of his property, indicating that the parties had a meeting of the minds on the object of the conspiracy.

█ However, not only does the evidence directly contradict plaintiff's desired inference that the conspirators knew about Pagan's mental deficiency prior to the transaction, but the other facts do not necessarily or even reasonably lead to the inference that the parties were doing anything but engaging in a normal real estate transaction. Specifically, uncontroverted evidence was presented at trial that finder's fee arrangements were normal banking practice for this type of loan, as was Capitol's requirement of taking a first trust deed against the property. Further, the record indicates that Stewart Title was not aware of the details of the Capitol loan prior to the transaction. Thus, the evidence does not provide anything more substantial than conjecture and speculation to show the ex-

istence of a conspiratorial relationship between the parties.

### IV. Unlawful Act

■ To assert civil conspiracy, plaintiff must also prove that the alleged conspirators performed one or more unlawful, overt acts. If the object of the alleged conspiracy or the means used to attain it is lawful, even if damage results to plaintiff or defendant acted with a malicious motive, there can be no civil action for conspiracy. "If such were not the rule, obviously many purely business dealings would give rise to an action in tort on behalf of one who may have been adversely affected." *Duffy*, 541 P.2d at 1202.

Plaintiff's brief suggests that the allegedly unlawful overt act at issue is fraud. The Utah Supreme Court, in *Taylor v. Gasor, Inc.*, 607 P.2d 293, 294 (Utah 1980), defines fraud as:

> the making of a false representation concerning a presently existing material fact which the representor either knew to be false or made recklessly without sufficient knowledge, or the omission of a material fact when there is a duty to disclose, for the purpose of inducing action on the part of the other party, with actual, justifiable reliance resulting in damage to that party.

■ A person cannot be liable for fraud unless he made the false representations himself, authorized someone to make them for him, or participated in the misrepresentation in some way, such as through a conspiracy. 37 C.J.S. *Fraud* § 61 (1943). There is no direct evidence in the present case that Capitol misrepresented a material fact known to be false. Nor is there direct evidence that Capitol acted for the purpose of inducing Pagan to sell his home or that Pagan relied upon Capitol's actions. Since

Capitol did not, by its own actions, defraud Pagan or authorize another to do so, Capitol's liability can only be established by proving that it was engaged in a conspiracy to defraud. However, the evidence shows that, other than providing financing, Capitol did not participate in Black's plan to purchase the home.[8]

Plaintiff argues that the evidence supports the following inferences: Hanks and Capitol were fully aware that the "notorious" real estate promoter, Black, was acting in concert with Cannon, whom they knew at the time to be a judgment-proof "straw man" unable to repay a $32,325.00 loan at 22%. They also knew that Black and Cannon had never requested or applied for a loan. Nevertheless, Capitol drafted the note and the first trust deed in Cannon's name without considering the $44,-000.00 sales price of the property and disregarded the $24,000.00 mortgage, of which Hanks was fully aware, between Pagan and Cannon. At the closing, judgment-proof Cannon was switched for Black as the buyer, while Hanks deliberately concealed the terms of the $32,325.00 loan from Pagan during the closing by delivering the loan documents to Stewart Title prior to the closing, but not disclosing them until after the closing was completed and the parties had left. The promoters, Cannon and Black, refused to make any payments on the $32,325.00 note or on the $24,000.00 contract, knowing that the trust deed on the $32,325.00 note would be foreclosed long before the due date on the $24,000.00 contract, and that because they were judgment-proof anyway, they would not be required to repay the loan. Furthermore, the entire transaction was financed entirely out of Pagan's equity, while the other parties received all the benefits without paying for them.

8. "[I]t is not sufficient that the circumstances lead to a mere suspicion of fraud, nor are they sufficient where they are as consistent with honesty and good faith as with fraud. When the proved or omitted facts are consistent with any reasonable theory of good faith and honest intent, they should be so construed. Fraud cannot be inferred or presumed from ambiguous evidence.... When it is sought to prove fraud by circumstantial evidence, the fraud must be such as would reasonably and naturally follow from the circumstances so proved, and fraud will not be lightly inferred. The collateral facts from which the inference of fraud is sought to be drawn must be proved precisely as facts are proved in other cases. Presumptions of fact from presumptions are not sufficient." 37 C.J.S. *Fraud* § 115 (1943) (footnote omitted).

Plaintiff has the burden of presenting clear and convincing evidence supporting his conspiracy theory. *Dill,* 583 P.2d at 499; *Crane v. Dahle,* 576 P.2d 870, 872 (Utah 1978). This evidence *must do more than merely raise a suspicion—it must lead to belief that the conspiracy existed. Dill,* 583 P.2d at 499 (emphasis in original). Such evidence is sufficient if it shows that the circumstances are consistent *only* with the existence of a conspiracy. *John Davis and Co. v. Cedar Glen No. Four, Inc.,* 75 Wash.2d 214, 450 P.2d 166, 172 (1969). Evidence is insufficient if it discloses acts just as consistent with a lawful purpose as with an unlawful one. *Accurate Prods., Inc. v. Snow,* 67 Wash.2d 416, 408 P.2d 1, 7 (1965); *Dill,* 583 P.2d at 499.[9] "Common sense and reason dictate that evil inferences should not be permitted to be drawn from routine business transactions where there are no other transactions. To hold otherwise would throw the door open for an attack on each and every transaction that one might enter into." *Holland v. Columbia Iron Mining Co.,* 4 Utah 2d 303, 293 P.2d 700, 702 (1956). Evidence, viewed in the light most favorable to the verdict, "disregarding evidence and inferences to the contrary," is, therefore, considered as a whole to determine whether the alleged conspirators were actually united in a scheme to defraud the plaintiff. *Morris v. Dodge Country, Inc.,* 85 N.M. 491, 513 P.2d 1273, 1274 (1973).

We accord due deference to the jury as the fact finder and do not substitute ourselves in this role. However, an appellant may successfully attack a jury's verdict by "[marshalling] all the evidence supporting the verdict and then [demonstrating] that, even viewing the evidence in the light most favorable to that verdict, the evidence is insufficient to support it." *Von Hake v. Thomas,* 705 P.2d 766, 769 (Utah 1985).

In the present case, the facts viewed as a whole not only do not compel an inference of conspiracy, but directly contradict plaintiff's conspiracy theory in many respects: First, Black's "notorious" reputation, with which Hanks was supposedly familiar, is unsupported by the record. Documentary evidence discloses that Cannon, rather than being judgment-proof at the time of the transaction, was in a strong financial position, but his fortunes reversed, making him judgment-proof at the time of trial. Despite Cannon's assertions to the contrary, documentary evidence indicates that he did, in fact, personally apply for the loan with Capitol, and that the loan was granted on the basis of his then financial strength. The amount of the loan was not made in total disregard of the value of Pagan's property, but was well within reasonable limits (65 to 85% of the appraised value of the property). The substitution of Cannon for Black was not only within the terms of the earnest money agreement, which directed that the name in which title would be vested would be designated at the time of closing, but was fully disclosed to Pagan, and was made on the basis of Cannon's relative financial strength as compared to Black's. Furthermore, it is uncontroverted that Hanks delivered the loan documents to Stewart Title *after,* not, as plaintiff's attorney alleges, *before* the closing; that the parties were aware of the loan's existence, approximate amount, and priority; and that Pagan had been informed of it.

9. "Facts of trifling importance when considered separately, or slight circumstances trivial and inconclusive in themselves, may afford clear evidence of fraud when considered in connection with each other. It has been said that in most cases fraud can be made out only by a concatenation of circumstances, many of which in themselves amount to very little, but in connection with others make a strong case." *Holmes v. McKey,* 383 P.2d 655, 666 (Okl.1963) (citing *Griffith v. Scott,* 128 Okl. 125, 261 P. 371 (1927)). However, "[w]here subsequent acts are relied upon to establish a conspiracy, they must clearly indicate the prior collusive combination and fraudulent purpose and must warrant the conclusion that the subsequent acts were done in furtherance of the unlawful combination and in pursuance of the fraudulent scheme. *Disconnected circumstances, any one of which, or all of which, are just as consistent with a lawful purpose as with an unlawful undertaking, are insufficient to establish a conspiracy." Dill,* 583 P.2d at 499. (emphasis in original) (quoting *Ballantine v. Cummings,* 220 Pa. 621, 70 A. 546, 547 (1908).)

The purchasers did, indeed, have some equity in the property and did, in fact, make efforts to repay the loan. Documentary evidence indicates that Cannon paid $1,000.00 earnest money directly from the loan proceeds, and personally extended the loan when it went into default. An unidentified person made a $2,700.00 payment on the loan pursuant to its being extended. Finally, the record shows that while Pagan paid closing costs customarily paid for by the seller, Cannon paid the closing costs customarily paid for by the buyer from his loan proceeds. Thus, many of the inferences upon which plaintiff relies to prove his fraud charge are totally unfounded because they are directly contradicted by uncontroverted evidence. Therefore, to adapt plaintiff's theory, the jury's finding would have to be based on conjecture and speculation.

### V. Damages

■ Finally, to assert a claim for civil conspiracy, plaintiff must show that he sustained damage as a proximate result of the conspiracy's activities because the conspiracy itself is not what gives rise to the right to action, but the torts committed in the furtherance of the conspiracy. *Duffy*, 541 P.2d at 1202; *Chicago Title Ins. Co.*, 444 P.2d at 488.

Plaintiff asserts that Pagan was damaged by losing $27,147.57 as a result of this transaction because he received only $16,857.43 in exchange for his $44,000.00 equity. Pagan sustained damage. However, because plaintiff has not shown sufficient evidence to reasonably imply the existence of a conspiracy, he cannot say that Pagan's loss was caused by the alleged conspiracy.

The purpose of a civil conspiracy action is to connect participating members in a transaction who otherwise would not be liable to the plaintiff. *Duffy*, 541 P.2d at 1202. Because Cannon, against whom Pagan could legitimately have a right of action, is judgment-proof, plaintiff's presumed purpose in arguing a conspiracy theory against Capitol is to obtain a judgment payable from Capitol's resources. However, even though the results of this transaction are unfortunate and possibly unfair,

we find that there is insufficient evidence to support the jury's finding that Capitol acted together with Cannon in a conspiracy to defraud Israel Pagan. Therefore, we reverse and remand for proceedings consistent with this opinion.

Because we do not find sufficient evidence to support plaintiff's conspiracy theory, Capitol is not liable for compensatory and punitive damages. Therefore, it is not necessary to address the issue of punitive damages.

JACKSON, J., concurs.

BENCH, J., concurs in result only.