Christa WENNEMAN, et al., Plaintiffs,

v.

Douglas E. BROWN, et al., Defendants.

Axel Hofstadt, et al., Plaintiffs,

v.

Wellshire Securities, Inc., et al., Defendants.

Nos. 2:94 CV 967B, 2:96 CV 327B.

United States District Court, D. Utah, Central Division.

March 19, 1999.

George Haley, Salt Lake City, UT, Greggory Savage, Salt Lake City, UT, Jessica Dillon, Salt Lake City, UT, J. Thomas Beckett, Salt Lake City, UT, Christina Jepson Schmutz, Salt Lake City, UT, for plaintiffs.

Peter Byrnes, Seattle, WA, Ralph Cromwell, SEATTLE, WA, Kimberly Boyce, Seattle, WA, Keith Petrak Seattle, WA, for defendants.

## OPINION AND ORDER

BENSON, District Judge.

### INTRODUCTION

The present issue comes before the Court on defendants Ballard Spahr Andrews & Ingersoll's and Richard T. Beard's ("Ballard Spahr") Motion to Dismiss plaintiffs' complaints for failure to state a claim upon which relief may be granted pursuant to Fed.R.Civ.P. 12(b)(6). In addition, defendant asserts plaintiffs' claims are inadequate under Fed.R.Civ.P. 9(b). On January 29, 1999, the Court heard oral argument on defendant's motion. Having considered the arguments of counsel, the pleadings, the briefs submitted and applicable law, this Court hereby grants defendants' motion in part and denies in part.

### BACKGROUND

#### I. Facts

These two actions were originally filed in October of 1994 (the Wenneman suit) and April of 1996 (the Hofstadt suit) by German Nationals alleging that their investments in various domestic entities were induced by securities violations, common law fraud, and conspiracy.[1] The investors originally sued defendants Hans Kuhlen, Doug Brown, and certain Wellshire entities, who perpetrated the frauds. Defendant Hans Kuhlen has been convicted several times in the United States and in Germany for fraud-related crimes. In 1990, Kuhlen devised a scheme that would allow him to sell stock in American companies to German investors without regulation or scrutiny by either United States or German authorities. Kuhlen enlisted the aid of defendant Douglas Brown, and together they formed Wellshire Securities, Inc., Wellshire Securities, GmbH, Wellshire Services, Inc., Benitex, A.G., Bellucci Est., and Serliana A.G., for the purpose of carrying out the scheme.

In summary, the scheme initially called for Benitex to enter into stock purchase agreements to buy stock in American start-up companies on credit. The stock would then be resold to German investors by Wellshire Securities, GmbH, a German company. Early on, however, irregularities began occurring. For example, stock in a given company would often be sold by

---

1. These two cases were ordered consolidated by this Court for purposes of discovery and trial on September 18, 1998.

Wellshire Securities, GmbH before the agreement between Benitex and an American start-up company was actually closed. Wellshire Securities, GmbH often sold more stock than it had actually purchased, and sometimes at prices 100 percent higher than those paid to the issuer. In October of 1991, Wellshire Securities, GmbH agreed to cease activities as a broker-dealer of securities in Germany and such broker-dealer functions were assumed by Wellshire Securities, Inc., a Utah corporation that was not licensed as a U.S. broker-dealer.

The sales to the German investors were allegedly induced through a series of fraudulent misrepresentations and omissions. Each investor was given various documents characterized by plaintiffs as "Disclosure Materials" which comprised of "New Account Data Sheets," a pamphlet entitled "Basics About Stock Exchange Transactions," several prospectuses of U.S. start-up companies, a newsletter called "Market Watch," and written confirmations of the transactions. The information contained in the Disclosure Materials, as well as in oral representations made to the German investors by Wellshire Securities, GmbH, can be classified into three general categories of misrepresentations: (1) misrepresentations about the professional qualifications of the Wellshire entities as a securities brokerage enterprise; (2) misrepresentations about the value of the securities being sold; and (3) misrepresentations about the legal bona fides of the transactions.

In early 1991, defendant Brown hired attorney Richard Beard of the law firm Ballard Spahr Andrews & Ingersoll, P.C. to represent the Wellshire entities. From 1991 to 1994 Ballard Spahr attorneys performed legal work for the Wellshire entities and several other companies that sold stock to the Wellshire entities. It is undisputed that defendant Ballard Spahr held numerous meetings with the principals of the Wellshire entities, performed legal research, drafted opinion letters on topics such as the necessity for registration as a broker dealer and the applicability of U.S. law—particularly Regulation S—and German law, and gave advice on business organization and structuring. Plaintiffs contend that Ballard Spahr was a primary participant in the scheme to defraud and have brought claims against Ballard Spahr for securities fraud under federal and state statutes, common law conspiracy, fraud, and negligence. Defendants have moved for dismissal on grounds that plaintiffs' claims (1) substantively fail pursuant to Fed.R.Civ.P. 12(b)(6), (2) fail for lack of particularity pursuant to Fed.R.Civ.P. 9(b), and (3) are barred by applicable statutes of limitations and statutes of repose.

## II. Standard of Review

The purpose of a motion to dismiss for failure to state a claim is to test the legal sufficiency of the complaint. In ruling on defendants' motion to dismiss, the court assumes the truth of all well-pleaded facts in plaintiff's complaint and views them in the light most favorable to plaintiff. *See Zinermon v. Burch,* 494 U.S. 113, 118, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990); *Roman v. Cessna Aircraft Co.,* 55 F.3d 542, 543 (10th Cir.1995). The court views all reasonable inferences in favor of the plaintiff, and the pleadings are construed liberally. *Id.* The court may dismiss the complaint for failure to state a claim upon which relief can be granted only if it appears to a certainty that plaintiff can prove no set of facts in support of its claim which would entitle plaintiff to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Cessna Aircraft,* 55 F.3d at 543. In reviewing the sufficiency of a complaint, the issue is not whether plaintiff will prevail, but whether plaintiff is entitled to offer evidence to support its claims. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). If the court chooses to dismiss the complaint, it must then decide whether to grant leave to amend. In general, leave to amend is denied if it is clear that amendment would be futile and that the complaint's deficiencies are incurable. *See Grossman v. Novell, Inc.,* 120 F.3d 1112,

1126 (10th Cir.1997) (holding that if the denial to amend rests on articulated reasons such as failure to cure deficiencies or futility of amendment the district court's decision shall stand).

Under Fed.R.Civ.P. 8(a) and (b), a plaintiff is required to set forth at least a short and plain statement of the facts sufficient to place the defendant on notice of the plaintiff's claims so as to be able to prepare a responsive pleading. *See Seattle-First Nat'l Bank v. Carlstedt,* 800 F.2d 1008, 1011 (10th Cir.1986). This is a liberal pleading requirement. However, where a plaintiff asserts claims arising out of fraud, the pleading requirement becomes more strict. Under Fed.R.Civ.P. 9(b) it is plain that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Even if fraud is not specifically alleged, claims must still be pled with particularity if the basis of the claim is fraudulent activity. *See Lochhead v. Alacano,* 662 F.Supp. 230, 234 (D.Utah 1987). Part of the reasoning behind Rule 9(b) is to avoid desultory accusations of moral turpitude which would only result in enormous social and economic costs absent some factual basis for supporting such claims. *See id.*

## DISCUSSION

### I. Securities Fraud Under Federal Law

The plaintiffs assert in both the Wenneman and Hofstadt complaints that defendant Ballard Spahr is subject to primary liability for securities fraud under § 10(b) of the 1934 Securities Exchange Act, and secondary liability as a "control person" under § 20(a) of the 1934 Act. The Court finds that for the following reasons plaintiffs have adequately stated a claim against defendant Ballard Spahr for Rule 10b–5 primary liability, but not for secondary liability as a "control person" under § 20(a) of the Act.

### A. Primary Liability Under § 10(b)

Section 10(b) of the Securities Exchange Act of 1934 ("Act") prohibits the use of "any manipulative or deceptive device or contrivance in contravention" of the securities rules and regulations. 15 U.S.C. § 78j(b). The corresponding "rule and regulation" set forth in Rule 10b–5 states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 CFR § 240.10b–5 (1993). The issue presented in the instant case is the interpretation of 10b–5 when the claim is applied against a professional such as an accountant or, as here, an attorney. Prior to the Supreme Court's decision in *Central Bank, N.A. v. First Interstate Bank, N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), professional accountants or attorneys were subject to primary liability for aiding and abetting behavior. As such, a professional could be subjected to liability as an aider and abettor where it was sufficiently alleged that the professional had knowledge of the primary violation and rendered "substantial assistance" in achieving the primary violation. *See Farlow v. Peat Marwick, Mitchell & Co.,* 956 F.2d 982, 986 (10th Cir.1992).

In *Central Bank,* however, the Supreme Court held that § 10(b) of the Securities Exchange Act of 1934 extended liability only to those who directly or indirectly engaged in the proscribed activities, i.e., those who employed a device, scheme or artifice to defraud, made untrue material

statements or omissions or committed a manipulative act. Formerly, aiding and abetting liability extended beyond such persons to those who did not engage in the proscribed activities at all, but who merely gave a degree of aid to those who did. *Central Bank*, 511 U.S. at 173–78, 114 S.Ct. 1439. In a literal interpretation of the plain language of the Act, the Supreme Court held that "a private plaintiff may not maintain an aiding and abetting suit under § 10(b)." *Id.* at 191, 114 S.Ct. 1439. Defendants urge that such limitation prohibits plaintiffs from bringing their claims against defendants Ballard Spahr and Beard. As the Court indicated, however,

> [t]he absence of § 10(b) aiding and abetting liability does not mean that secondary actors in the securities markets are always free from liability under the securities Acts. Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies *may be liable as a primary violator* under 10b–5, assuming *all* of the requirements for primary liability under Rule 10b–5 are met.

*Id.* (emphasis added) (citations omitted). In this Court's opinion, the holding in *Central Bank* applies with equal force to subsections (a), (b), and (c) of Rule 10b–5.[2]

Pursuant to the holding in *Central Bank*, in order for plaintiffs in the present case to survive dismissal of their § 10(b) claims, they must allege in their complaints that defendant Ballard Spahr was not just aiding and abetting, but was a primary violator under Rule 10b–5.

■ The Tenth Circuit recently addressed the issue of what constitutes primary liability in *Anixter v. Home–Stake Prod. Co.*, 77 F.3d 1215 (10th Cir.1996). The Court in *Anixter* held that in order to establish primary liability under § 10(b), a

plaintiff must prove the following facts: (1) that the defendant made an untrue statement of material fact, or failed to state a material fact; (2) that the conduct occurred in connection with the purchase or sale of a security; (3) that the defendant made the statement or omission with scienter; and (4) that plaintiff relied on the misrepresentation, and sustained damages as a proximate result of the misrepresentation. *Id.* at 1225. The Court also indicated that "[t]he critical element separating primary from aiding and abetting violations is the existence of a representation, either by statement or omission, made by the defendant, that is relied upon by the plaintiff. Reliance only on representations made by others cannot itself form the basis of liability." *Id.* at 1225. It must be noted, however, that there is no requirement that the alleged violator directly communicate misrepresentations to plaintiffs in order for primary liability to attach. *Id.* at 1226; *SEC v. Holschuh*, 694 F.2d 130, 142 (7th Cir.1982) (reasoning that "actual or first-hand contact with offerees or buyers [is not] a condition precedent to primary liability for antifraud violations"). The test to hold an accountant or an attorney primarily liable for misrepresentations, therefore, has become whether the defendant "knew or should have known that his misrepresentation would be communicated to investors." *Id.* In conclusion, the Tenth Circuit determined that upon "[r]eading the language of § 10(b) and 10b–5 through the lens of *Central Bank*" in order for a professional to "use or employ" a "deception" actionable under the antifraud law, they must themselves make a false or misleading statement or omission or manipulative act that they know or should know will reach potential investors. *Id.* at 1225–26.

■ Having reviewed plaintiffs' allegations against defendant Ballard Spahr and

---

**2.** Plaintiffs have attempted, in their briefs and in oral argument, to limit the holding in *Central Bank* to only those claims arising under subsection (b) of Rule 10b–5. This argument is not persuasive. The *Central Bank* decision did not limit its analysis to claims under subsection (b) of Rule 10b–5, but rather addressed the scope of all conduct prohibited in general by § 10(b) and held "aiding and abetting" to not be within such prohibited conduct regardless of the subsection being applied.

being mindful of Rule 9(b) and in harmony with the foregoing discussion, the Court is satisfied that the allegations and the record in this case are presently sufficient to survive the pleading requirements imposed at this stage of the litigation. Plaintiffs allege misrepresentations and omissions which, if proved, could place defendant Ballard Spahr in an active role in the alleged scheme to defraud. Among other things, plaintiffs allege that in May of 1993, one month after forming GWAG, Ballard Spahr documented a purchase of GWAG shares by the Wellshire entities even though they knew that Wellshire had been selling GWAG shares for some time, that Wellshire planned to charge a 100% mark-up to German purchasers of GWAG shares, and that Wellshire intended to manipulate the price of GWAG shares so that the price would rise from $6 per share to not less than $14 per share. The complaint alleges that Ballard Spahr also produced an offering memorandum that was provided to German investors, which omitted these material facts. These and other similar factual allegations, when viewed in the light most favorable to the plaintiff, are sufficient to allege a claim for primary liability under Rule 10b–5.

Furthermore, plaintiffs sufficiently allege that Ballard Spahr was a principal architect and active participant in a conspiracy, the object of which was to commit fraud in connection with the purchase and sale of securities. While *Central Bank* eliminated a cause of action against an aider and abettor, it did not preclude a plaintiff from bringing a claim against members of a conspiracy to defraud so long as the plaintiff sufficiently alleges facts which would support a finding that a particular participant could be primarily liable as a co-conspirator under Rule 10b–5. *See Central Bank*, 511 U.S. at 191, 114 S.Ct. 1439. In the present case, plaintiffs assert that Ballard Spahr; Beard; Kuhlen; Brown and others conspired to make money by selling worthless and grossly overvalued securities to unsuspecting German investors. Defendants did so, plaintiffs allege, by knowingly engaging in a conspiracy the object of which was to mislead German investors to believe they were investing in registered American securities which were federally insured and actively traded on regulated United States Securities exchanges. These allegations, taken in the light most favorable to plaintiffs, do not merely place defendants Ballard Spahr and Beard in the role of aiders and abettors, but as co-conspirators, and, therefore, as primary violators which includes "[a]ny person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser" relies.[3] *Id.* Ultimately, such allegations

---

**3.** The Court is aware of several court decisions finding that *Central Bank* eliminated conspiracy liability as well as aiding and abetting liability. See, e.g. *Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld*, 135 F.3d 837, 841 (2d Cir.1998) and the cases cited therein. There is, however, no specific reference to conspiracy liability in *Central Bank*. This Court recognizes fundamental and significant differences between aiding and abetting, by which a person gives aid to a criminal wrongdoer, and conspiracy, by which a person knowingly joins others in a criminal undertaking with a common criminal goal. It is true there is some limited overlap in the two concepts but the Court reads nothing in *Central Bank* as a wholesale adoption of the notion that one who willingly conspires with others to disseminate fraudulent information in connection with a purchase or sale of a security is immune from liability under the

Securities Act merely because that person is intelligent or lucky enough to avoid being the one who actually drafts the fraudulent documents or who deals directly with the victims. Conspiracy is a separate and distinct concept from aiding and abetting. *See Pereira v. United States*, 347 U.S. 1, 10–11, 74 S.Ct. 358, 98 L.Ed. 435 (1954).

The plain language of Section 10b–5 states "It shall be unlawful for any person, directly or indirectly ... to employ any device, scheme, or artifice to defraud...." It is difficult for this Court to see how such language fails to include an active member of a conspiracy whose object is to "employ" a scheme to defraud. By contrast, a mere aider and abettor cannot be said to have "employed" the scheme to defraud, even though he knows it exists. Every principal member of a conspiracy is the "employer" of the scheme to

may not prove accurate on a motion for summary judgment, but at this preliminary stage they are sufficient to survive defendants' motion to dismiss.

### B. Secondary Liability Under § 20(a)

 In order to properly plead a claim for secondary liability under § 20(a) of the Securities Exchange Act of 1934, the plaintiffs must allege that defendant Ballard Spahr is a "control person" of the Wellshire entities. To state a prima facie case of control person liability, the plaintiff must establish (1) a primary violation of the securities laws and (2) "control" over the primary violator by the alleged controlling person. *See Maher v. Durango Metals, Inc.,* 144 F.3d 1302 (10th Cir.1998). While it is true the statute is remedial in nature and to be construed liberally, the SEC defines "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 CFR § 230.405; *see also First Interstate Bank v. Pring,* 969 F.2d 891, 898 (10th Cir.1992) (citing with approval the SEC's broad definition of "control"). A plaintiff must allege facts, with sufficient particularity, that the defendant actually participated in the operations of the corporation and possessed the power to control the specific transactions or activities upon which the primary violations are predicated. *Id.* (citing with approval the Eighth Circuit's test in *Metge v. Baehler,* 762 F.2d 621 (8th Cir.1985)).

In the present case, plaintiffs' complaints fail to adequately allege that defendant Ballard Spahr possessed any direct or indirect power to bind or control the Wellshire entities. What is alleged is that Ballard Spahr had the ability to influence the conduct of Brown, Kuhlen, and the Wellshire entities, but this alone is insufficient to place defendant Ballard Spahr within the definition of a "control person." While this Court recognizes that the con-

trol person determination is a factual question not ordinarily subject to resolution on a motion to dismiss, dismissal is appropriate where, as in the present case, a plaintiff does not plead any facts from which it can reasonably be inferred that the defendant was a control person. *See Maher,* 144 F.3d at 1306. As such, plaintiffs' claims of "control person" liability under § 20(a) must be dismissed.

## II. Securities Fraud Under State Law

 While the Utah Uniform Securities Act, Utah Code Ann. § 61–1–22, is modeled after the Federal Securities Exchange Act of 1934 it contains a more stringent standard for applying primary liability. The Utah Act imposes primary liability on the part of those who offer, sell, or purchase securities in violation of its provisions. Because the Utah Act requires this essential element of privity between the seller and buyer, primary liability is limited to "sellers" of securities. *See Gohler v. Wood,* 919 P.2d 561, 562–66 (Utah 1996).

 The issue of whether a party is considered a "seller" under the Utah Act is governed by the same standard as that which applies to claims of primary liability under § 12(2) of the Federal Securities Act of 1933. *See FSLIC v. Provo Excelsior Ltd.,* 664 F.Supp. 1405 (D.Utah 1987) (finding "seller" under the Utah Act to be identical to "seller" under § 12(2)). Section 12(2) defines a "seller" as one who actually passes title to the stock or who actively solicits the purchase motivated by a desire to serve his own financial interests or those of the securities owner. Under this standard, plaintiffs have failed to allege sufficient facts which indicate defendant Ballard Spahr was ever in privity, as a seller, with any plaintiff purchaser. As such, no basis for primary liability under the Utah Act exists.

 The Court equally determines that plaintiffs have failed to properly al-

---

defraud. While it may be true that every co-conspirator is an aider and abettor, it is not

always true that every aider and abettor is a co-conspirator.

lege secondary liability under the Utah Act. Although the Utah Act provides for secondary liability on the part of one who *directly or indirectly* controls a "seller" who is primarily liable, the issue of "control" is the focus of analysis. The Utah Act must be construed so "as to effectuate its general purpose to make uniform the law of those states which enact it and to coordinate interpretation and administration of this chapter with the related federal regulation." Utah Code Ann. § 61–1–27. As such, the Court finds that plaintiffs fail to allege secondary liability under the Utah Act for the same reasons outlined above with respect to the issue of "control" under the federal counterpart. Thus, plaintiffs' claims of state securities fraud must be dismissed.

## III. Common Law Claims

In addition to federal and state securities fraud claims, plaintiffs have asserted claims against defendants for civil conspiracy, fraud, and negligence. Taking each claim individually, the Court must be satisfied that plaintiffs allege with the requisite particularity, facts which would give rise to a valid claim.

### A. Civil Conspiracy

In order to succeed on a claim for civil conspiracy the plaintiffs must be able to show the following elements: (1) a combination of two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result thereof. *See Israel Pagan Estate v. Cannon,* 746 P.2d 785 (Utah App.1987). As the Court in *Israel Pagan* noted, "it is not necessary in a civil conspiracy action to prove that the parties actually came together and entered into a formal agreement to do the acts complained of by direct evidence." *Id.* at 791. "Instead, conspiracy may be inferred from circumstantial evidence, including the nature of the act done, the relations of the parties, and the interests of the alleged conspirators." *Id.* At a minimum, however, there must be substantial proof of circumstances from which it reasonably follows, or may be reasonably inferred, that the conspiracy existed. *See id.* Mere conjecture and speculation is insufficient.

Based upon the holding of *Israel Pagan* and its progeny and for the same reasons stated earlier regarding conspiracy under the federal securities laws, this Court finds plaintiffs have alleged a civil conspiracy claim against Ballard Spahr to overcome defendant's motion to dismiss for failure to state a claim. When the Court marries the multitude of allegations made against defendant Ballard Spahr in both the Hofstadt and Wenneman complaints, to the "nature of the act done, the relations of the parties, and the interests of the alleged conspirators" it is satisfied that a claim for civil conspiracy has been alleged. As such, defendant's motion for dismissal is denied with respect to plaintiffs' civil conspiracy claim.

### B. Fraud

To prove fraud, plaintiffs must show (1) a representation, (2) of an existing material fact, (3) which was false, (4) which the speaker knew to be false, or made recklessly knowing that he had insufficient information upon which to make the representation, (5) for the purpose of inducing another to act, (6) that the other person reasonably was without knowledge of the falseness of the representation, (7) in fact relied on this representation, and (8) was thereby induced to act to his injury or damage. *See Gold Std., Inc. v. Getty Oil Co.,* 915 P.2d 1060, 1067 (Utah 1996). The Court agrees with plaintiffs that at this stage in the proceedings, a claim for fraud has been sufficiently alleged based on a conspiracy theory. As indicated above, plaintiffs have alleged with specificity numerous allegations of known misrepresentations by Ballard Spahr and Beard. Additionally, plaintiffs have alleged that they relied on such misrepresentations and that the misrepresentations were made to induce plaintiffs' actions and that plaintiffs

acted to their detriment. (*Hofstadt Compl.* ¶¶ 1301, 1304, 1307; *Wennemann Compl.* ¶¶ 1232–35, 1238). As such, plaintiffs' fraud claim must be allowed to proceed.

### C. Negligence

 Likewise, plaintiffs have adequately alleged a claim for negligence. Plaintiffs have alleged a basis for which this Court could reasonably find that defendants Ballard Spahr and Beard owed a duty to plaintiffs. Typically, in order to find the existence of a duty owed by a lawyer, there must be an attorney-client relationship. *See Williams v. Barber,* 765 P.2d 887, 889 (Utah 1988). Such a determination is a question of law. *See Trujillo v. Jenkins,* 840 P.2d 777, 778 (Utah 1992). Defendants argue that the duty alleged here is not that which would arise out of an attorney-client relationship and therefore inadequate to permit plaintiffs' claim to go forward. Plaintiffs assert, however, the duty owed by Ballard Spahr and Beard is a recognized duty owed to a third party in Utah if it can be shown that defendant Ballard Spahr knew that these third parties would rely on its work. *See Salt Lake School Dist. v. Galbraith & Green, Inc.,* 740 P.2d 284, 288 (Utah App.1987).

Although it is uncertain whether plaintiffs will succeed at the summary judgment level, plaintiffs at this initial stage have sufficiently alleged a claim for negligence.

### IV. Statutes of Limitation and Repose

 Defendants Ballard Spahr and Beard raise Statutes of Limitations and Repose arguments with respect to the securities fraud allegations. An action claiming a violation of Rule 10b–5 must be filed "within one year after the discovery of the facts constituting the violation and within three years after such violation." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 364, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). "Discovery" may be imputed to a plaintiff when he is put on "inquiry notice" of his claims under Rule 10b–5, meaning he becomes aware of facts that would have led a rea-

sonable person to investigate whether he might have a claim. *See Marks v. CDW Computer Centers, Inc.,* 122 F.3d 363 (7th Cir.1997) (referencing *Tregenza v. Great American Communications Co.,* 12 F.3d 717–18, 722 (7th Cir.1993)).

 It has long been the rule that a court should not dismiss a complaint for failure to state a claim unless convinced that the plaintiff cannot prove any set of facts that would entitle him to relief. In the present case, the Court is not convinced at this stage of the proceedings that plaintiffs cannot prove sufficient facts to place plaintiff on inquiry notice of a claim for securities fraud under Rule 10b–5. Such a determination is a question of fact, and, as courts have recognized, is often inappropriate for resolution on a motion to dismiss under Rule 12(b)(6). *See Id.* at 367. In this case, plaintiffs effectively filed suit against defendants Ballard Spahr and Beard on October 1, 1997. Defendants argue that several facts reveal that plaintiffs were on inquiry notice prior to October 1, 1996 or one year prior to the filing of plaintiffs lawsuit. First, defendants argue that all of the purchases of securities took place well before October 1, 1996. Defendants say that plaintiffs should have been on inquiry notice because in prior complaints, plaintiffs affirmatively pled claims against John Doe defendants "who materially aided and participated in the securities transactions" including "legal, accounting and financial advisors to defendants in respect to the activities complained of" and who "directly or indirectly controlled any of the defendants." Additionally, defendants argue that the criminal indictments filed in December 1995 against Brown, Kuhlen and the Wellshire entities were sufficient to put plaintiffs on inquiry notice well before October 1, 1996. Ballard Spahr and Beard argue that certain items of information available in the "public domain," such as an article published in Germany disclosing various information about Wellshire and its business practices, were

available to plaintiffs and sufficient to put plaintiffs on inquiry notice of Ballard Spahr's representation of the Wellshire entities. Defendants also assert that even if none of these or other events served to put plaintiffs on inquiry notice, plaintiffs, because of lack of diligence in discovering such events, should be deemed to have been on notice. Plaintiffs counter that it was not until the summer of 1997 that they had inquiry notice of Ballard Spahr's and Beard's involvement in the alleged scheme to defraud.[4]

While many of the facts raised by defendants may have put plaintiffs on notice that Ballard Spahr and Beard represented the Wellshire entities, such facts do not sufficiently indicate that plaintiffs were on inquiry notice that Ballard Spahr and Beard were involved in the construction or perpetuation of the scheme to defraud. In order to find inquiry notice, the Court must be satisfied that the facts constituting inquiry notice are "sufficiently probative of fraud—sufficiently advanced beyond the stage of a mere suspicion, sufficiently confirmed or substantiated—not only to incite the victim to investigate but also to enable him to tie up any loose ends and complete the investigation in time to file a timely suit." *Id.* at 368 (referencing *Fujisawa Pharmaceutical Co., Ltd. v. Kapoor,* 115 F.3d 1332, 1335 (7th Cir.1997)). Except in the most extreme circumstances, and this Court does not find the facts in this case to be extreme, the trier of fact should determine when, and under what circumstances, the running of the statute of limitations was triggered. As such, the Court is not inclined to dismiss plaintiffs' claims under either the federal or state statutes of limitations and repose.

### CONCLUSION

For the reasons stated above, the Court hereby GRANTS defendants Ballard Spahr's and Beard's Motion to Dismiss with respect to plaintiffs' § 20(a) claim for "secondary liability" and claims for state securities fraud. The Court hereby DENIES defendants' motion with respect to plaintiffs' Rule 10b–5 Primary Liability claim and common law claims of Conspiracy, Fraud, and Negligence.

---

4. As far as the three-year statute of repose defense, plaintiffs have conceded that some of their securities fraud claims against Ballard Spahr and Beard are time-barred and as such do not seek damages for those purchases made prior to October 1, 1994.